# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**JOSE TORRES.** | Case No. 20-mj-10059<br><br>**OPINION AND ORDER** |

**KIEL**, **UNITED STATES MAGISTRATE JUDGE**

THIS MATTER comes before the Court on defendant Jose Torres's (Defendant) application for release on bail pursuant to 18 U.S.C. §3142(c). (ECF No. 25.) The Government opposes the application. (ECF No. 26 (Gov't. Br.)) A hearing on the application was held on May 14, 2020. For the following reasons, the application is **DENIED**.

## BACKGROUND

### I. CHARGES AND INITIAL APPEARANCE

The Government charged Defendant in a two-count criminal complaint on February 13, 2020 with violating 18 U.S.C. § 2422(a) by knowingly persuading, inducing, enticing, and coercing two individuals—one from the State of New York and the other from Canada—to travel to New Jersey to engage in prostitution or in sexual activity for which a person can be charged with a criminal offense; and attempted to do so. (ECF No. 1.) Law enforcement authorities arrested Defendant in Massachusetts on February 14, 2020. (Gov't. Br. p. 2.)

At his initial appearance on February 18, 2020 before the United States District Court for the District of Massachusetts, Defendant waived his right to an identity hearing, preliminary hearing, and bail hearing. (ECF No. 4.) On March

17, 2020, I held a bail hearing and determined there was no condition or combination of conditions that would reasonably assure the safety of the community or Defendant's appearance as required.  (ECF No. 17.)   Defendant had proposed a bail package that included: (1)              and                as cosigners of a non-equity bond; (2) residence at the home of             and                  (collectively, the         ); (3) a third-party custodian, who would also act as a cosigner of the bond; (4) internet restrictions; and (5) GPS location monitoring.  At the time, however, the proposed third-party custodian and cosigners had not been vetted by pretrial services to determine whether they were appropriate for these roles.

**II.     EXTENSION OF PRELIMINARY HEARING**

The bail hearing followed immediately after a hearing on the Government's motion pursuant to Rule 5.1(d) to extend the time to conduct a preliminary hearing to April 27, 2020.  The Government sought the extension because of the inability to convene a grand jury in light of the COVID-19 pandemic.  (ECF No. 10.)[1]  Over Defendant's objection, I granted the extension.  (ECF No. 11.)

The Government filed a second motion to extend the time to conduct a preliminary hearing to June 29, 2020 because of the ongoing inability to convene a grand jury.  (ECF No. 18.)   Again, given the extraordinary circumstances and over Defendant's objection, I granted the additional extension.[2]  (ECF No. 24.)

---

[1] It was unclear whether Defendant waived his right to a preliminary hearing at the initial appearance before this Court. (ECF No. 10 p. 1.) The confusion arose when Defendant's retained-counsel, in the midst of the initial appearance, asked to be relieved as counsel. (*Id.*)  The Court conducted a hearing on March 17, 2020 to ensure Defendant had knowingly waived his right to a preliminary hearing.  Defendant, however, said he did *not* waive the right.  Lisa Mack, Esq. of the Federal Public Defender's Office ably represented Defendant at the hearing and requested bail on his behalf.  (ECF. No. 14.)

[2] Defendant believes the Government should not be permitted to rely on any information outside the pretrial services' reports. (Def. Br. p. 5.)  Because a preliminary hearing has not been conducted and he has not been indicted, Defendant argues he is handicapped by the lack of discovery, which he would otherwise be able to review to counter the Government's proffer. (*Id.*)  It is my understanding, however, the Government has provided Defendant's counsel with subpoena returns from T-Mobile, credit card companies, and hotels.  Further, the Government has offered to produce additional discovery subject to

### III. THE PRESENT MOTION

Defendant now returns to Court seeking pretrial release under the following conditions: (1) a $200,000 bond secured by the equity in the _____ home; (2) the _____ and _____ as cosigners of the bond; (3) the _____ as third-party custodians; (4) home detention with GPS location monitoring; (5) pre-trial services supervision; (6) surrender of all passports and travel documents; (7) no contact with any victims or witnesses slated to testify, upon the specific identification of these persons by the Government; (8) monitoring of Defendant's cell phone, computer, and internet access; and (9) all other standard conditions of home detention.  (ECF No. 25.)

## ANALYSIS

### I. THE BAIL REFORM ACT

Pretrial release and detention are governed by the Bail Reform Act (Act) of 1984.  18 U.S.C. § 3141-56.  The Act requires a judicial officer to release a defendant before trial under the "least restrictive" conditions.  18 U.S.C. § 3142(c)(1)(B). However, a judicial officer shall order the detention of a person before trial if he finds "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  The factors to consider are: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).

---

the entry of a protective order.  (Gov't. Br. p. 7.)  During the hearing on May 14, 2020, the parties argued about the propriety of the Government's proposed protective order.  The proposed protective order was not provided to me prior to the hearing and the issue as not raised before the hearing, therefore, I did not address the issue.

## II. FIRST BAIL HEARING

After argument on the first bail application, I determined there was no condition or combination of conditions that would reasonably assure the safety of the community. In my decision, I noted that the alleged illegal activity targets and exploits an extremely vulnerable segment of our society. There is no doubt that commercial sex workers who operate in the shadows of our communities, are likely to be reluctant to seek assistance from law enforcement authorities when crimes are committed against them, and similarly reluctant to cooperate in a criminal investigation relating to their work. The Government proffered substantial circumstantial evidence showing Defendant had targeted and exploited a substantial number of commercial sex workers in the recent past and was engaging in the same activity at the time of his arrest on February 14, 2020.

For example, from February 5 to 8, 2020, Defendant contacted 96 commercial sex workers and had 778 contacts with them by text message or telephone call. The Government proffered that at the time of his arrest, Defendant had four cell phones and three laptops in his possession. Defendant also had at least 80 different telephone numbers—with what the Government believes are "burner phones"—in 2019. Defendant also had 108 single-night hotel stays in New Jersey in 2019, although he is a New Jersey resident.

The criminal complaint alleges that from 2015 through 2019, Defendant lured commercial sex workers to New Jersey with the promise to pay them large amounts of money. The alleged victim from New York told law enforcement authorities she was lured to a house in Middlesex County, New Jersey. When she attempted to leave, Defendant forced her to perform unwanted sexual activity. She alleges she was slapped and choked. The alleged victim from Canada told law enforcement authorities she was lured to a hotel in East Brunswick, New Jersey. When she tried to leave the room, Defendant forced her to engage in rough sexual intercourse, and slapped and choked her. He allegedly said he was a police officer. Both women claim Defendant failed to pay them the money he had promised to lure them to New Jersey. Law enforcement authorities have allegedly learned of other commercial sex

4

workers who were similarly abused and "intercepted a victim from another district" recently before Defendant's arrest. (ECF. No. 1.) Additionally, on the day of his arrest, two commercial sex workers were allegedly in Defendant's hotel room in Massachusetts. (Gov't. Br. p. 7.)

The totality of the circumstantial evidence, the statements from the two alleged victims, and the results of the law enforcement authorities' investigation, paint an alarming picture of a person who presents a serious danger to the community and, in particular, to commercial sex workers. The bail package proposed by Defendant at the first hearing did not overcome the clear and convincing evidence demonstrating the danger to the community, if Defendant were released.

Defendant residency in New Jersey for decade provided little assurance he is not a serious flight risk. He was born in El Salvador and immigrated to the United States in 1986. He does not have family in New Jersey. He is divorced and his children live with his former wife in another state. Defendant has used various aliases in his alleged criminal activity. When interviewed by pretrial services, he "did not indicate any travel outside the United States." Defendant, however, has traveled internationally on at least a dozen trips over the past three years, including six trips to Colombia and four trips to El Salvador. (Gov't. Br. p. 5.)

Defendant's risk of flight was further compounded by the inconsistencies in his statements concerning his financial condition. He worked as an accountant for decades and reported a high income. Defendant also has a consulting business based in Colombia and New York. He initially reported substantial liquid assets, but later reported nearly no assets when seeking court-appointment counsel. I was concerned this apparent inconsistency was Defendant's attempt to deflect any concern that he may have the means and motive to flee. The combination of these facts demonstrated, by a preponderance of the evidence, a serious risk of flight.

### III. NEW INFORMATION

A detention hearing may be reopened "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and

that has a material bearing on the issue" of safety to the community and risk of flight. 18 U.S.C. § 3142(f)(2).  Because the new information presented by Defendants may have a bearing on my prior conclusions, I reopened the detention hearing and heard counsel's arguments on May 14, 2020.

The new "information" Defendant presents is a $200,000 bond secured by a residential property, three "friends" who are willing to be cosigners for the bond, and two third-party custodians.  The           , who are alleged to be Defendant's friends, own the property and would act as third-party custodians.                  ,          , and                          have agreed to be cosigners of the bond. Importantly, all the individuals who have agreed to be cosigners and/or third-party custodians have been vetted and approved by pretrial services.  Defendant assures the Court he will not let down his friends who have "put themselves on the line for him."  (Df. Br. p. 3.)

The Government in its opposition to the Motion also presented new information.  The new information from the Government provides further bases to conclude Defendant is a serious flight risk.  The Government found over 100 contacts in foreign countries in Defendant's mobile phones, which were seized at the time of his arrest.  Since his detention, Defendant has made approximately 65 international telephone calls in 60 days.  (Gov't. Br. p. 5.)[3]  In a few of the calls the Government was able to listen to, Defendant sought financial assistance from his family in El Salvador.  He also sought assistance in "convinc[ing] various 'friends' in the United States to put up money, homes, and other resources in order to support his release from prison."  (*Id.*)

Additionally, Defendant's inconsistent story about the whereabouts of his family is of concern.  Initially, Defendant reported that his parents and two brothers live in Florida.  In actuality, his mother and two half-brothers live in El Salvador.

---

[3] The Government's brief cites to "at least a dozen" calls to El Salvador since his detention. During the hearing, the Government proffered that, upon further review, there were approximately 65 international calls in approximately 60 days, with many of the calls to El Salvador and Colombia.

6

testified he recently spoke to Defendant's mother in El Salvador who is very concerned about Defendant. During the hearing, moreover, Defendant explained that he was referring to his "adopted family" when he initially provided information to pretrial services.[4]

Defendant's prior inconsistent statements about his financial resources and family, his high income as an accountant, combined with the new information from the Government, give me reason for serious concern that Defendant has the means—either through his own assets or from others—and motive to flee. Accordingly, the new information from Defendant does not overcome the substantial evidence of Defendant's risk of flight.

Defendant also argues that the          willingness to serve as third-party custodians alleviates any concern his release may pose a danger to the community. The Government, however, points out that Defendant has met          only a few times and their relationship is very attenuated—"          has a cousin who is married to [] Defendant's brother." (Gov't. Br. p. 5.)

I questioned the          during the hearing. I also provided an opportunity for counsel to ask questions.          provided a very different account of his relationship with Defendant than that proffered by the Government.
testified he has known Defendant for eight years. He would see Defendant once a week, or once every two weeks.          testified that Defendant is related to him through          niece. When I asked          of his understanding of Defendant's employment, he testified he understood Defendant is involved in the "cannabis" business and with a business that helps people start new businesses.

   assured me no one had pressured him to act as a third-party custodian or put up his house as collateral for the bond.          heard my questions and          answers. She confirmed she believed          answers to my questions were truthful.

---

[4] Before he spoke, I cautioned and advised Defendant of his right to remain silent and advised him to exercise that right.

Defendant's requests to his family in El Salvador asking them to get assistance from friends in the United States coupled with the attenuated relationship between he and the         —which I conclude based in part on         not knowing the nature of Defendant's employment—does not convince me the         will be able to effectively monitor Defendant's activities. Therefore, the successful vetting by pretrial services does not overcome the clear and convincing evidence of Defendant's danger to the community.

Indeed, a skeptical person might conclude the         were convinced by Defendant's relatives in El Salvador to put up their home as collateral and act as third-party custodians in order to secure Defendant's release and eventual escape from this jurisdiction.[5] Given the serious charges against Defendant and his substantial ties to South America, this prospect is of serious concern to me and requires Defendant's continued pretrial detention. The Government has shown, by the preponderance of the evidence, that Defendant is a serious flight risk.

## CONCLUSION AND ORDER

Accordingly, for the foregoing reasons:

**IT IS** on this **14th** day of **May 2020 Ordered** that:

1. The application for release on bail is **DENIED**.
2. The Clerk of the Court is directed to terminate the motion at **ECF No. 25**.

*/s/ Edward S. Kiel*
**Edward S. Kiel**
**UNITED STATES MAGISTRATE JUDGE**

---

[5] The Government believes the extradition treaty between the United States and El Salvador does not require the extradition of a person from El Salvador to the United States for the criminal chargees against Defendant. Although no citation was provided during the hearing, I believe the Government was referring to the *Treaty of Extradition Between the United States of America and El Salvador*, 37 Stat. 1516, Art. II (1911).

8